1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9
LILA M. WALLACE,                                    CASE NO. 1:10-cv-01551-SMS

10
                            Plaintiff,
                                                    ORDER AFFIRMING AGENCY'S
11
        v.                                          DENIAL OF BENEFITS AND ORDERING
                                                    JUDGMENT FOR COMMISSIONER
12
MICHAEL J. ASTRUE,
Commissioner of Social Security,
13
                            Defendant.
14
_____/

15
16          Plaintiff Lila M. Wallace, by her attorneys, Law Offices of Lawrence D. Rohlfing, seeks

17  judicial review of the final decision of the Commissioner of Social Security ("Commissioner")

18  denying her application for disability insurance benefits under Title II of the Social Security Act

19  (42 U.S.C. § 301 *et seq.*) (the "Act").  The matter is currently before the Court on the parties'

20  cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder,

21  United States Magistrate Judge.  Following review of the record as a whole and applicable law,

22  this Court affirms the agency's determination to deny benefits to Plaintiff.

**I.      Administrative Record**

23
     **A.      Procedural History**

24          Plaintiff was insured under the Act through December 31, 2008.  On January 6, 2005,

25  Plaintiff filed for disability insurance benefits, alleging disability beginning September 10, 2003.

26  Her claim was initially denied on May 20, 2005, and upon reconsideration.  Plaintiff appeared and

27  testified at a hearing on August 30, 2006.  On September 22, 2006, Administrative Law Judge

28

1  Edward C. Graham denied Plaintiff's application.  Plaintiff appealed to the Administrative

2  Council, which remanded the matter to the ALJ on October 28, 2008, for consideration of

3  additional evidence.

4       Plaintiff appeared and testified at a second hearing on September 15, 2009.  On October

5  30, 2009, Judge Graham again denied Plaintiff's application.  Plaintiff appealed to the

6  Administrative Council, which denied review on July 2, 2010.  On August 17, 2010, Plaintiff filed

7  her District Court complaint.

8       **B.**    **Agency Record**

9       Plaintiff (born August 17, 1957) was injured in an auto accident on May 28, 2003.  She

10  claimed that neck and hip injuries caused pain that prevented her working.

11      Plaintiff completed secretarial training and attended one year of college.  From 1988

12  through 1999, Plaintiff worked as a supermarket baker, mixing bread dough and doughnuts,

13  preparing products, and decorating cakes.  From 2000 until shortly after her auto accident,

14  Plaintiff was an interior technician for an business that designed and maintained plants in

15  commercial spaces such as malls, offices, and hospitals.

16      In May 2005, Plaintiff reported more frequent neck spasms and dropping of items since

17  beginning physical therapy.  She was unable to pick up heavy items.  When Plaintiff reached

18  above her head, she experienced neck spasms and "instant migraines."

19      In a disability report completed April 19, 2006, Plaintiff reported that she was receiving

20  pain management services.  She was unable to grip, "dropping things all the time."  She could no

21  longer decorate a cake or open her medicine bottles.  Her pain medications were working poorly,

22  impairing her ability to sleep.  Plaintiff experienced panic attacks when she rode in a car and was

23  constantly afraid of increasing her neck injury.  She complained of vertigo.  Her medications

24  included Estrace (hormones), Inderal (antianginal), pamelor (antidepressant), phenegan

25  (antihistamine), and Xanax (anxiolytic).  The agency interviewer observed no difficulties in

26  behavior, appearance, grooming, or limitations.

27      **Agency Hearing (August 30, 2006).**  At the agency hearing on August 30, 2006, Plaintiff

28  testified that, following her auto accident, she had to call on her boyfriend [now her husband, Jack

Rosema] to help her do her plant maintenance job since she was unable to climb ladders and pull the heavy hoses.  Shortly thereafter, her doctor told her that her efforts to keep her job had exacerbated her injuries.  Describing the condition of her neck as bones sitting on bones, Plaintiff testified that she had pain from her head through her neck and arms.  She was weak and nauseous. She dropped things frequently.

Plaintiff testified that she had migraine headaches that lasted for several days two or three times monthly.  She wore a neck brace since turning her head too quickly would cause a neck spasm followed by a migraine headache.  Her neck made constant crackling noises that sounded like Rice Krispies.  She experienced burning and tingling from her shoulder blades to her fingers. She could not have surgery to correct her neck problem because she had osteopenia.

On a typical day, Plaintiff got out of bed only to use the bathroom and briefly sit in the living room.  Because of her many medical conditions, she was constantly sick.  Her daughter helped her with personal care, cleaning shopping, and driving.

Plaintiff testified that she could stand and walk one-and-a-half to two hours and sit two-and-a-half hours in an eight-hour work day.  She could sit no more than ten to fifteen minutes at a time, and could not lift more than ten pounds.

**Agency Hearing (September 15, 2009).**  Plaintiff testified that, since the first hearing, she was frequently experiencing numbness and pain in her feet.  She fell often.  Her memory had deteriorated, requiring her husband to make her a box to help her manage her medication.  Her overall pain level was "very chronic."  AR 1028.  Since experiencing her seizures, she was taking morphine and experiencing tremors and a lack of coordination.  Even with medication, she could not sleep.  Plaintiff experienced incapacitating migraines three or four times weekly.  She was confined to bed two to three days at a time.  Her doctors encouraged her to move around so she would not atrophy.  Lying in bend caused back spasms.

Plaintiff could stand for less than two minutes.  She could sit for less than five minutes, swaying and moving back and forth.  Plaintiff did not shop, cook or clean.  Her sole activity was to sit outside and smell the rose garden that her husband had planted for her.

///

1    Plaintiff's husband, Jack Rosema, testified that Plaintiff had experienced migraines before

2  her car accident.  Plaintiff returned to work the day after her accident but required his help to pull

3  the hose needed to water the plants since any activity "would pop her neck out."  AR 1034.

4  Plaintiff did not see a doctor until she became unable to do her job even with Rosema's help.  She

5  chose to see a chiropractor.

6    Rosema testified that Plaintiff had problems with concentration and memory, particularly

7  with her medications.  For example, Plaintiff overmedicated herself because her prescriptions

8  directed her to take a pill when she felt pain and she could not keep track of how many she had

9  taken in her attempts to control her chronic pain.  Eventually, overdosing on pain killers led to

10  Plaintiff's seizures.  Plaintiff was able to sleep only for short periods.  She could not handle stress

11  and could not communicate her emotions.

12    **Quality Health Medical Center.**[1]  Chiropractor David E. Eckel, D.C., began treating

13  Plaintiff on July 29, 2003.  On September 9, 2003, Eckel referred Plaintiff to a neurologist.  On

14  November 19, 2003, Eckel referred Plaintiff to "Dr. Prakash" for pain management, noting her

15  persistent headaches, left scapular pain, and left hip burning.  Plaintiff's prescription medications

16  included Keppra,[2] Flexeril,[3] and Seroquel.[4]

17    On September 23, 2003, radiologist Ronald L. McGrady, M.D., interpreted an MRI

18  examination.  He reported:

19    Loss of normal cervical lordosis, either related to patient's positioning or spasm
      with mild to moderate degenerative disc disease at the C5-6 level.  There is mild to

20

21    [1]  Quality Medical Health Center provides various services at various offices.  David E. Eckel, D.C.,

22  provided chiropractic services at A.V. Chiro-Sport, located at 43403 #C 10th Avenue West, Lancaster, California.
   Medical Director Ram Prakash, M.D., was based at the home office of Quality Medical Health Center, located at

23  1011 East Avenue J, Lancaster, California.  The record does not indicate whether Ram Prakash, M.D., and
   Ramanathan Prakash, M.D., who treated Plaintiff, are the same person.

24    [2]  Keppra (levetiracetam) is an anticonvulsant prescribed to treat seizures in individuals with epilepsy.

25  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001067 (January 10, 2012).

26    [3]  Flexeril (cyclobenzaprine) is a muscle relaxant used with rest and physical therapy to relax muscles and
   relieve pain caused by sprains, strains, and other muscle injuries.

27  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000699 (January 10, 2012).

28    [4]  Seroquel (quetiapine ) is used to treat symptoms of schizophrenia and bipolar disorder.
   www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001030 (January 10, 2012).

moderate left-sided neural foraminal stenosis at the C 5-6 level as well.  no acute fractures are demonstrated.

AR 379.

The pain management specialists at Quality Health Medical Center treated Plaintiff from December 2, 2003, through January 20, 2004, when she was discharged as having reached maximum medical improvement.  Plaintiff reported that since the auto accident, she had been treated by chiropractors and a neurologist, had undergone physical therapy, and was taking Flexeril and Seroquel.  Pain management consultant Chitta Thiagarajah, M.D., examined Plaintiff on December 9, 2003, and noted "limitation of lateral rotation and flexion of the neck," but found that extension was "slightly limited, but almost normal."  AR 270.

Thiagarajah provided a course of facet joint injections in Plaintiff's cervical spine on December 9 and 16, 2003, and January 13, 2004.  On February 10, 2004, Plaintiff reported receiving relief from acupuncture but complained of migraine headaches.  Plaintiff's final diagnosis was interscapular neuritis, chronic cervical sprain/strain, left cervical radiculopathy, depression, chronic pain, and anxiety.  The diagnosis also indicated "loss of normal lordosis, cervical spine, with mild to moderate degenerative disc disease at the C5-67 level, and mild to moderate left-sided neural foraminal stenosis (722.71) at the C5-6 level, as per MRI scan examination dated 09-23-03."  AR 240.

At follow-up appointments in January 2005, Plaintiff continued to complain of chronic neck pain and extreme pain in her left hip and leg. She continued to wear a cervical brace.  Her medications included Fiornal[5] and Percodan.[6]  Noting that Plaintiff complained that her whole body ached, Ramanathan Prakash, M.D., reported that Plaintiff's physical condition was unchanged since February 20, 2004.  Prakash diagnosed possible traumatic fibromyalgia and generalized pain, and referred Plaintiff to a rheumatologist.

///

---

[5]  Fiornal (aspirin, butalbital, and caffeine) is used to releive tension headaches. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000027 (January 10, 2012).

[6]  Percodan (aspirin and oxycodone) is a narcotic medication used to treat moderate to severe pain. www.drugs.com/percodan.html (January 10, 2012).

**Kaiser Permanente.**  When Plaintiff first saw Sukanya E. Holmes, M.D., in the physical medicine department of Kaiser Permanente in June 2005, she reported chronic neck pain since her 2003 accident that had worsened with physical therapy and chiropractic treatment.  She experienced headaches that kept her in bed two to three days a week.  Plaintiff reported that she was not taking Vicodin[7] and had not received chronic pain management.  After noting pain behavior,[8] no atrophy, a full range of neck motion, and 5/5 strength, Dr. S. Holmes diagnosed chronic neck pain syndrome and cervical degenerative disc disease, and referred Plaintiff for pain management.

On August 12, 2005, Plaintiff's primary care physician, Steven Lawenda, M.D., completed a short-form evaluation for musculoskeletal impairments. Lawenda reported that he saw Plaintiff approximately every two months to treat her chronic neck pain.  He assessed her range of motion as approximately 45 degrees flexion, 30 degrees extension, 45 degrees right lateral, and 45 degrees left lateral.[9]  Sensory and motor nerves, and reflexes were intact.  There was no atrophy. Straight leg raising was positive on the left.[10]

Carson Ling, M.D., performed a consultative examination on September 6, 2005.  He observed that Plaintiff's neck had a full range of motion without pain except for mild pain on extension.  Plaintiff demonstrated positive trigger points bilaterally in her trapezius and

---

[7]  Vicodin (acetaminophen and hydrocodone) is a narcotic pain releiver prescribed for moderate to severe pain.  www.drugs.com/vicodin.html (January 10, 2012).

[8]  When patients claim to experience persistent pain that is not warranted by the injury or illness, the psychological disorder is called "pain behavior."  Pain behavior may be indicated by improbable descriptions of pain, progression of the severity and extent of the pain over time, multiple treatments, exaggerated facial expressions of pain, abnormal posture, frequent grimacing and sighing, and rubbing of affected parts. Physical examination may induce over-reaction to the examination, superficial skin tenderness, distribution of sensory or motor abnormalities that are not dermatomic in distribution, and excessive guarding and bracing.  S.P. Tyrer, "Learned Pain Behaviour," 292 *Brit. Med. J.* 6512 (January 4, 1986), *reproduced at* www.ncbi.nlm.nih.gov/pmc/PMC1338966 (January 10, 2012).

[9]  Normal ranges of neck motion are flexion (touch chin to sternum), 70-90°; extension (pointing chin up), 55 °; lateral bending (bring ear toward shoulder), 35°; and rotation (70 ° left and right). web.mit.edu/tkd/stretch/stretching_8.html (December 23, 2011).

[10]  The straight leg raising test is administered during a physical examination to determine whether a patient with low back pain has an underlying herniated disc.  The test is positive if the patient experiences pain down the back of the leg when the leg is raised.  *Miller v. Astrue*, 2010 WL 4942814 (E.D. Cal. November 30, 2010) (No. 1:09-cv-1257-SKO).

paracervical regions.  Strength was 5/5; reflexes were equivocal; and sensation was decreased on the left in contrast to the right.  Ling referred Plaintiff to a neurologist based on her reports of recent increased weakness and dropping things.

On October 11, 2005, neurologist Shilpa Wali, M.D., examined Plaintiff and recorded this impression:

> This is a 48-year-old lady with a history of motor vehicle accident with some whiplash injury.  Since then, she has had chronic pain in her neck as well as all of her limbs.  In addition, she has numbness and tingling of her hands that is chronic in nature.  Neurologic exam reveals the presence of a nondermotomal pattern of numbness to pinprick in her upper extremities, involving both the entire upper extremities bilaterally and patchy patterns on the left lower extremity distally.  She has negative Phalen's and Tinel's signs.  In addition, the remainder of her neurologic exam is normal and nonfocal.  Differential diagnosis for patient's symptoms of pain and numbness include a chronic pain syndrome secondary to motor vehicle accident with ensuing cervicalgia.  The numbness and tingling that she experiences in her upper extremities may reflect the presence of some radicular component; however, this pattern is not established on examination today, and rather may just be part of her chronic pain syndrome.  She has no suggestion of a carpal tunnel syndrome, either.  She has no evidence of weakness.  On her examination, her strength is full in the distal hand muscles as well as proximal and the entire lower extremities.  In view of the persistent complaints and persistent symptoms of numbness and tingling, however, her MRI of the cervical spine will be repeated to ensure that there is no worsening of the foraminal stenosis that was present before.  She has no evidence of cervical myopathy on exam today; however, this can also be excluded by MRI of the cervical spine.  She has no evidence to support a carotid artery dissection as well, in view of her history of trauma and back pain, thus this in not likely a factor contributing to her chronic pain syndrome.  Patient has responded well to Pamelor and she is taking only one tablet a night, presumably 25 mg, thus I have asked her to increase this to 2 tablets a night and I have given her a prescription to last her for the month, followed by which she will be seen by pain doctors.  This can be further titrated up.  I have also discussed with her extensively that she has problems with polypharmacy at this time and when the nortriptyline is at a therapeutic dose for her, she may be able to reduce some of her medicines, such as temazepam and Vicodin and Fiorinal, as the Pamelor will also prove as a headache-prevention medicine and will help her migraine as well as chronic pain.

AR 470-473; 505.[11]

Following magnetic resonance imaging on October 15, 2005, radiologist Andrew Deutsch, M.D., diagnosed "mild discogenic disease of the cervical spine most evident at the C5-C6 level where a small broad based disc/osteophyte complex [was] present effacing the ventral ///

---

[11]  Pamelor (nortriptyline) is a tricyclic antidepressant. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000732 (January 10, 2012).

1  subarachnoid space but no[t] significant[ly]the cervical cord," and mild foraminal narrowing.  AR
2  492.  Deutsch also noted a lesion, possibly a polyp or cyst, in the right vallecula.

3        On July 14, 2006, Lawenda signed a letter "to whom it may concern" reporting that
4  Plaintiff suffered chronic severe pain that required daily medication including narcotic pain killers
5  and anti-inflammatory medications.

6        On November 2006, Plaintiff was treated in the emergency room when she experienced an
7  episode of apnea during a severe migraine.  Dr. Lawenda hypothesized that Plaintiff likely
8  overdosed on Endocet[12] and switched her prescription to longer-acting morphine.

9        Dr. Wali prescribed Verapamil[13] to prevent the headaches.  On January 25, 2007, Plaintiff
10 told Wali that her headaches were better on Verapamil.  Wali could not rule out that Plaintiff's
11 headaches were cardiovascular and directed Plaintiff to modify her lifestyle to reduce her
12 cholestrol and to consult her primary care physician about a daily aspirin regimen.

13       In June 2007, therapist Paul Enns, Ph.D., M.F.T., performed an intake examination for the
14 outpatient psychiatry clinic.  Dr. Lawenda had referred Plaintiff for evaluation and treatment of
15 depression.  Plaintiff reported "lots of pain" and told Enns that she spent 90 per cent of her time in
16 bed.  Her marriage was not going well, and she needed to get SSI benefits to support herself so
17 that she could leave her husband.

18       Psychiatrist Scott Martin Steiglitz, M.D., conducted a psychiatric medication evaluation in
19 August 2007.  Steiglitz did not prescribe an anti-depressant since Plaintiff had tried multiple anti-
20 depressants without benefit.

21       On August 31, 2007, Plaintiff began treatment with therapist Dennis James Pfanner,
22 M.F.T.  Plaintiff told Pfanner that her husband was very controlling and was jealous of her large
23 circle of friends.  She reported that she spent her days gardening, which was her passion.   The
24 therapy session addressed ways to improve Plaintiff's communication with her husband.  On

25

26      [12] Endocet, a combination of acetaminophen and oxycodone, is prescribed for moderate to severe pain.
27 www.drugs.com/endocet.html (January 3, 2012).

       [13] Verapamil is a calcium-channel blocker prescribed to treat high blood pressure.  It works by relaxing the
28 blood vessels.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000818/ (January 3, 2012).

September 21, 2007, Plaintiff complained that she and her husband argued continually, that he used foul language against her, and tried to manipulate and isolate her.  He was continuing a significant relationship with his ex-wife.  On December 7, 2007, Plaintiff reported continuing marital conflict.

In September 2007, Neil Thomas Katz, M.D., a sports medicine practitioner evaluated Plaintiff's complaints of shoulder pain.  Katz diagnosed right shoulder pain, right shoulder weakness, right shoulder RTC tendinitis, right shoulder bicipital tendinitis, and right shoulder impingement syndrome.  He referred Plaintiff for physical therapy and directed her to consult her primary care physician about the use of an anti-inflammatory medication.

On November 15, 2007, Plaintiff asked Lawenda to prescribe Soma[14] for her neck pain.

On December 7, 2009, Lawenda completed a residual functional capacity questionnaire apparently provided by Plaintiff's attorneys.  He opined that "most activity or prolonged sitting or standing" was precluded by Plaintiff's severe, constant, and persistent neck pain.  AR 793.  Her physical condition was further affected by depression, anxiety, and psychological factors.  Plaintiff's pain was frequently sufficient to interfere with attention and concentration, and she was incapable of performing even low-stress jobs.  Plaintiff could sit no more than 45 minutes at a time and could stand no more than 30 minutes at a time.  She could stand or walk less than two hours in an eight-hour work day.  She required a five-to-ten-minute break every 30 to 45 minutes.  Plaintiff could occasionally lift less than ten pounds.  She could perform manipulative activities for no more than five per cent of an eight-hour workday.  Plaintiff would have good days and bad days, and could be expected to miss work more than four times per month.

Plaintiff was hospitalized with pneumonia in December 2009.  On January 15, 2010, Dr. Lawenda prepared a second residual functional capacity questionnaire on which he indicated that Plaintiff had experienced bilateral pulmonary emboli and suffered mild chest pain on inspiration.  Most activity or prolonged sitting or standing was precluded by Plaintiff's chest pain and severe,

---

[14]  Soma (carisprodol) is a muscle relaxant used with rest and physical therapy to relax muscles and reklieve pain and discomfort caused by sprains, strains, and other muscle injuries. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000699 (January 10, 2012).

1  constant, and persistent neck pain.  Her physical condition was further affected by depression and

2  anxiety.  Plaintiff's pain was frequently sufficient to interfere with attention and concentration,

3  and she was incapable of performing even low-stress jobs.  Plaintiff could sit no more than 45

4  minutes at a time and could stand no more than 10 minutes at a time.  She could stand or walk less

5  than two hours in an eight-hour work day.  She required a five-to-ten-minute break every 30

6  minutes.  Plaintiff could occasionally lift less than ten pounds.  She could perform manipulative

7  activities for no more than five per cent of an eight-hour workday.  Plaintiff would have good days

8  and bad days, and could be expected to miss work more than three times per month.

9        **Dr. Simonian.**  On April 14, 2005, psychiatrist Stephen Simonian, M.D., performed a

10  psychiatric evaluation as an agency consultant.  He diagnosed:

11        Axis I:        Adjustment disorder with mixed emotional features.

12        Axis II:       No diagnosis.

13        Axis III:      1) Neck pain by history.
                         2) Back pain by history.
14                       3) Migraine headaches by history.

15        Axis IV:       Psychological stressors: Moderate.

16        Axis V:        The claimant was well dressed.  Hygiene was good.  The claimant is
                         able to do her activities of daily living.  She has her own house and
17                       takes care of the house.  The claimant is able to drive.  The claimant
                         drove to the evaluation today.
18
                         The claimant's mental status examination does not manifest any
19                       major disorder of thought process or content.  Affect was
                         appropriate and full range.  She has friends.  The claimant is able to
20                       socialize.  Functional activity was judged to be 65 percent.

21        AR 400.

22        Dr. Simonian further opined that Plaintiff was able to understand, remember and carry out

23  both simple one- and two-step instructions and detailed instructions; able to relate and interact

24  with supervisors, co-workers, and the public; able to maintain concentration and attention; able to

25  associate day-to-day work activity, including attendance and safety; able to adapt to the stresses

26  common to a normal work environment; able to maintain regular attendance in the work place and

27  to perform work activities on a consistent basis; and able to perform work activities without

28  special or additional supervision.

**Dr. Tran.** On April 18, 2005, Juliane Tran, M.D., board certified in physical medicine and rehabilitation, performed a comprehensive orthopedic evaluation as an agency consultant. Tran opined:

1.   Neck pain possible from cervical facet joint dysfunction and also cervical sprain/strain.  No evidence of cervical radiculopathy.  The claimant has pain with cervical range of motion and tenderness to palpation over the cervical spine and cervical facet joint, but symmetrical reflexes, strength, and normal sensation throughout.  There is no evidence of carpal tunnel syndrome and cubital tunnel syndrome. She has negative Phalen's and Tinel's test.

2.   Back pain probably from sprain/strain.

3.   Post-traumatic left hip pain.  The claimant has pain in the left hip with the end range of hip flexion and mildly positive Faber's test in the left hip and mild left hip joint tenderness to palpation.  This, however, has not affected her gait pattern or her movement.

Based on this examination, she is restricted to activities lifting more than 100 pounds occasionally or more than 50 pounds frequently.  She may be restricted with activities involving frequent negotiating of steps, stairs, or uneven terrain. There is no restriction with sitting, standing, walking, climbing, balancing, or working with heights.  There are no visual restrictions.  No environmental restrictions.  No restrictions with bending, stooping, kneeling, crouching.  No sitting restrictions.  No fingering, grasping, or overhead reaching restrictions.

AR 406-407.

**Agency physicians.** On May 16, 2005, John T. Bonner, M.D., prepared a residual functional capacity analysis.  He concluded that Plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds; she could stand, walk, and sit about 6 hours in an eight-hor work day. Because of her subjective pain, Plaintiff could not perform any work requiring forceful push or pull with her left leg.  Her back and hip pain limited her to occasionally climbing ramps or stairs, stooping, crouching, and crawling, She should never climb ladders, ropes, or scaffolds.  She could frequently balance or kneel.  Because of her neck pain she should only reach overhead occasionally.  She should avoid uneven terrain.  Bonner commented that Plaintiff's subjective degree of complaints and limitations was not adequately supported by her medical records.

Dr. Bonner; Marina Vea, M.D.; and psychiatrist Luyen T. Luu, M.D., all signed off on Plaintiff's psychiatric review technique, which identified affective disorders that were not severe.

///

**Dr. Vesali.**  On March 20, 2009, agency consultant Fariba Vesali, M.D., a specialist in physical medicine and rehabilitation, examined Plaintiff.  Vesali stated:

> There are no focal neurological deficits on today's exam.
>
> The claimant walks with a normal gait.  Tandem gait and Romberg tests are negative bilaterally.  Finger-nose test and rapid alternative hand movements are normal.
>
> From my assessment of the claimant, I do not feel that the condition will impose any limitation for 12 continuous months.
>
> AR 71.

Visali opined that Plaintiff could stand and walk for six hours in an eight-hour work day; sit six hours in an eight-hour work day; and could frequently lift and carry eleven to twenty pounds and could occasionally carry up to fifty pounds..  She needed no assistive device to walk, and had no postural or manipulative limitations.  Her sole environmental limitation was working around excessive noise when she was experiencing headaches.

**Kathleen Cannon.**  On April 29, 2010, Kathleen Cannon, MSW, LCSW, completed a mental impairment questionnaire of a form apparently prepared by Plaintiff's attorneys.  Cannon had treated Plaintiff since April 1, 2010, seeing Plaintiff twice and speaking with her by telephone three times.  According to Cannon, Plaintiff exhibited poor memory; appetite disturbance with weight change, sleep disturbance; blunt, flat or inappropriate affect; decreased energy; anhedonia or pervasive loss of interest; difficulty thinking or concentrating; intrusive recollections of a traumatic experience; and hostility and irritability.  Plaintiff could be expected to miss work about three times monthly.  She had moderate restrictions of daily living and in maintaining social functioning; frequent deficiencies of concentration, persistence or pace resulting in a failure to complete tasks in a timely manner; and continual episodes of deterioration or decompensation.

## II.    Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of

12

1  such severity that he or she is not only unable to do his or her previous work, but cannot,

2  considering age, education, and work experience, engage in any other substantial gainful work

3  existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

4       To encourage uniformity in decision making, the Commissioner has promulgated

5  regulations prescribing a five-step sequential process for evaluating an alleged disability.  20

6  C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following

7  questions:

8       Step one:       Is the claimant engaging in substantial gainful activity?  If so, the
                          claimant is found not disabled.  If not, proceed to step two.
9
        Step two:       Does the claimant have a "severe" impairment?  If so, proceed to
10                        step three.  If not, then a finding of not disabled is appropriate.

11      Step three:     Does the claimant's impairment or combination of impairments
                          meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P,
12                        App. 1?  If so, the claimant is automatically determined disabled.  If
                          not, proceed to step four.
13
        Step four:      Is the claimant capable of performing his past work?  If so, the
14                        claimant is not disabled.  If not, proceed to step five.

15      Step five:      Does the claimant have the residual functional capacity to perform
                          any other work?  If so, the claimant is not disabled.  If not, the
16                        claimant is disabled.

17      *Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

18      The ALJ found that Plaintiff had not engaged in substantial gainful activity since the

19  alleged onset date of September 10, 2003.[15]  Her severe impairments were chronic pain and

20  depression.   Neither impairment met or equaled the requirements of a listed impairment.

21      Plaintiff retained the residual functional capacity to perform medium work as defined in

22  20 C.F.R. § 404.1567(c) with occasional climbing, balancing, stooping, kneeling, crouching, and

23  crawling.  She had mild-to-moderate restriction of activities of daily living; mild-to-moderate

24  difficulties in maintaining social functioning; mild-to-moderate difficulties in maintaining

25  concentration, persistence, or pace; and no episodes of decompensation. She could perform basic

26  ///

27

28
       [15] Elsewhere, the ALJ found that Plaintiff had continued to work through the fourth quarter of 2003.

13

unskilled work.  Specifically, despite her impairment, Plaintiff was able to perform her past

relevant work as a grocery baker.

**III.    Scope of Review**

Congress has provided a limited scope of judicial review of the Commissioner's decision

to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

a court must determine whether substantial evidence supports the Commissioner's decision.  42

U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*,

402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d

1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must

be considered, weighing both the evidence that supports and the evidence that detracts from the

Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the

evidence and making findings, the Commissioner must apply the proper legal standards. *See, e.g.,*

*Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's

determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if

the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health and*

*Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

**IV.    Plaintiff's Credibility**

Plaintiff contends that the ALJ failed to articulate clear and convincing reasons to support

his finding that her testimony lacked credibility.  The Commissioner disagrees.

An ALJ is not "required to believe every allegation of disabling pain" or other non-

exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*,

885 F.2d 597, 603 (9th Cir. 1989).  But if he or she decides to reject a claimant's pain testimony

after a medical impairment has been established, the ALJ must make specific findings assessing

the credibility of the claimant's subjective complaints. *Ceguerra v. Secretary of Health and*

*Human Services*, 933 F.2d 735, 738 (9th Cir. 1991). *See also Bunnell v. Sullivan*, 947 F.2d 341,

346 (9th Cir. 1991).  "[T]he ALJ must identify what testimony is not credible and what evidence

undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of*

*Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988).  He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive.  *Orn*, 495 F.3d at 635.  *See also Robbins v. Social Security Administration*, 466 F.3d 880, 885 (9th Cir. 2006).  The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."  *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms.  *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996).  If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision.  *Thomas*, 278 F.3d at 959.

The Ninth Circuit has summarized the applicable standard:

[T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'" *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999) (quoting *Lester*, 81 F.3d at 834).  The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.*  Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and

conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

*Orn*, 495 F.3d at 635.

Plaintiff argues that the ALJ failed to give clear and convincing reasons for finding her not credible. The Commissioner and this Court disagree. The ALJ provided a detailed discussion of his reasoning in concluding that Plaintiff was not credible:

> I cannot rely on the claimant's testimony as establishing greater limitations than those set forth above because her statements are not entirely credible. It was noted at the hearing, that she looked tired and unhappy, but otherwise there was no medical or physical limitations. It was also noted that she exaggerated her pain and symptoms. It was further noted at the hearing that she appeared overly medicated: she appeared addicted to morphine. Her husband, Jack Rosema, testified that "I let her use my Imitrex." He admitted that she overmedicated herself, alleging that she was on extended release morphine. The claimant's daily activities are also inconsistent with her allegations. She testified that all she did was staying at home and sitting in the yard. She reported that she spent her day gardening (her passion) and socializing with friends/family members. I find that the claimant's inconsistencies negatively impact her credibility and do not permit reliance on her statements.

AR 22 (*citations to administrative exhibits omitted*).

The October 2009 hearing decision, addressing specific issues on remand, incorporated by reference the September 2006 hearing decision. AR 21. In his factual findings, Judge Graham noted that the conservative treatment that Plaintiff received was not consistent with the excessive pain to which she testified. She had not had physical therapy since February 2004 and did not use a TENS unit or home remedies such as a heating pad, hot water bottle, or hot baths. Although she wore a neck brace, Plaintiff was able to sit through the hearing with no signs of pain or discomfort. In his analysis, the ALJ elaborated:

> I cannot rely on the claimant's testimony as establishing greater limitations than those set forth above [in the opinion of the consultative examiner] because her statements are not entirely credible. She portrayed herself as being practically totally disabled. However, at the hearing, it was noted that she exaggerated excessively and she did not appear to be in any distress. It is noted that she was involved in her automobile accident on May 28, 2003 and although she reported an onset date of September 10, 2003 (four months later), it is clearly obvious that she worked through the end of 2003 (see earnings record, 4 quarters of coverage). She initially denied drinking alcohol, but later reported that she had a DUI in 2001. The claimant does not seem too motivated to work and appeared to be benefit-seeking. It is noted that she filed a lawsuit and was awarded benefits ($15,000.00) in 2006, she is also renting a room in her home. It is also noted that she requested a disabled parking sticker. Her daily activities are also inconsistent with her

16

allegations.  She initially reported that she took care of her own home, she did her activities of daily living, drove her car and socialized with friends.  However, at the hearing, she testified that her daughter did everything for her and that all she did was "sit a lot".  She admitted, however, that she had a boyfriend.  I find that the claimant's inconsistencies negatively impact her credibility and do not permit reliance on her statements.

AR 40 (*citations to administrative exhibits omitted*).

As detailed in the factual statement above, Plaintiff's testimony and reports to the agency and to the doctors who treated and examined her varied greatly depending on the audience.  Plaintiff's statements were internally inconsistent.  She testified that she got out of bed only briefly and told Dr. Enns that she spent 90% of her time in bed, but told her therapist, Dennis Pfanner, that she spent all her time indulging her gardening passion and that her husband was jealous of her large social circle. She reported that her daughter had to help her with driving yet she drove herself to her appointment with Dr. Simonian, whom she told that she was able to perform activities of daily living, including care of her home, and that she had friends with whom she was able to socialize.  Pfanner included within Plaintiff's treatment objectives securing social security disability assistance, which would give her the financial freedom to end her marriage.

Plaintiff's reported symptoms were inconsistent with objective medical assessments: she claimed to be unable to grip but assessments by Dr. Holmes and Dr. Ling showed 5/5 strength.  Agency orthopedist Juliane Tran, M.D., reported normal gait, symmetrical reflexes, strength, and normal sensation, with no signs of carpal or cubital tunnel syndrome.  Agency consultant Fariba Vesali, M.D., who found no neurological deficits, normal gait and normal testing, concluded that Plaintiff had no limitations that would last for twelve continuous months.  Dr. Wali observed no evidence of weakness, ruled out carpal tunnel syndrome, and searched vainly for a recognizable pattern of symptoms, noting that the neurologic exam was "normal and nonfocal."  Wali concluded her comments by noting Plaintiff's problems with "polypharmacy." that is, too many or excessive medications. *See Dorland's Illustrated Medical Dictionary* at 1331 (28th ed. 1994).  Both Holmes and Wali noted signs of pain behavior.  Dr. Lawenda attributed the apnea that required repeated emergency room treatment to Plaintiff's overdosing on Endocet.  Such factors support a finding that the claimant lacks credibility. *See, e.g., Oregon v. Barnhart*, 26 Fed.Appx.

1  691, 693 (9th Cir. 2002) (noting that the ALJ provided clear and convincing reasons in support of a

2  finding that the claimant lacked credibility, including "inconsistency between claimed conditions

3  and medical evidence; inconsistency between claimed limitations and daily activities;

4  inconsistency between Claimant's testimony and that of her lay witnesses and internal consistency

5  between her own statements; absence of pain behavior during the hearing; Claimant's historic

6  lack of interest on working; and the ALJ's observation that he 'did not consider her demeanor to

7  be believable.'"); *South v. Chater*, 116 F.3d 486 (Table), 1997 WL 312548 at *1 (9th Cir. June 9,

8  1997) (No. 96-35728).

9         For the first time in this appeal, the Commissioner suggests that Plaintiff was clearly

10  malingering.  The ALJ not having addressed below whether Plaintiff might be malingering, this

11  Court need not address that contention now.  Substantial evidence supported the ALJ's conclusion

12  that Plaintiff's testimony lacked credibility and was entitled to little weight.  Nothing more is

13  required.

14  **V.     Rosema's Testimony**

15         Plaintiff contends that reversal and remand for payment of benefits is required since the

16  ALJ failed to articulate any reason for disregarding Rosema's testimony.  The Commissioner

17  replies that any error in the ALJ's failing to explicitly comment of Rosema's credibility is

18  harmless.

19         Rosema's opinion is set forth in less than five pages of testimony at the second

20  administrative hearing (September 15, 2009) (AR 1033-1038).  He testified that Plaintiff had

21  suffered from migraines before her 2003 auto accident but that she became unable to work after

22  the auto accident when she was no longer able to pull the hoses to water the plants.  Rosema shed

23  some light on Plaintiff's situation by testifying that Plaintiff did not initially think she had been

24  injured in the accident and had not even seen a doctor until she began experiencing such severe

25  pain that she had to quit her job.  Then, she went to see a chiropractor and a lawyer.

26         Rosema supported his conclusion that Plaintiff had concentration and memory problems

27  by explaining that Plaintiff had caused her own "seizures" by overdosing on pain medications that

28  ///

were prescribed to be taken when Plaintiff felt pain.  According to Rosema, Plaintiff's constant severe pain and memory problems resulted in her overmedicating herself.

Rosema also testified that Plaintiff was unable to sleep for prolonged periods, could not handle stress, and could not articulate her problems.  He knew that she was experiencing severe pain because, although she had previously been a hard worker, she now remained in bed for days at a time.  Rosema knew Plaintiff remained in bed because she did not even open the windows during the day.

In the course of explaining his conclusion that Plaintiff herself was not credible, the ALJ acknowledged Rosema's testimony that he shared his Imitrex with Plaintiff and Rosema's admission that Plaintiff overmedicated herself.

"Lay testimony as to a claimant's *symptoms* is competent evidence which the Secretary must take into account, unless he ultimately determines to disregard such testimony, in which case 'he must give reasons that are germane to each witness.'"  *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996), *quoting Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).  Friends and family members who are in a position to observe the claimant's symptoms and daily activities are competent to testify about their observations of the claimant's condition.  *Dodrill*, 12 F.3d at 918-19.  An ALJ's disregard of the testimony of friends and family members violates the regulations, which provide for consideration of the observations of non-medical sources regarding the effects of the claimant's impairments on his ability to work.  *Id., citing* 20 C.F.R. § 404.1513(e)(2).[16]  *See also Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987).  When a claimant alleges symptoms that are not supported by medical evidence in the record, the agency directs the adjudicator to obtain information about those symptoms from third parties likely to have such knowledge.  SSR 88-13.  The ALJ must give "full consideration" to such testimony.  Id.

Rosema's brief testimony adds little to our understanding of Plaintiff's symptoms other than documenting that Plaintiff suffered migraines even before her accident when she was still working and that Plaintiff did not initially seek medical care after the accident until continued

---

[16]  The relevant section is now designated 20 C.F.R. § 1513 (d)(4).

pain prompted her to see a chiropractor and a lawyer.  Since that information is hardly favorable to Plaintiff's contentions, the Court agrees with the Commissioner that any error presented by the ALJ's brief acknowledgment of Rosema's testimony did not constitute reversible error.

**VI.**    **Lawenda's Opinion**

Plaintiff contends that the ALJ erred in failing to articulate a legitimate basis for rejecting Dr. Lawenda's opinion of her residual functional capacity.  The Commissioner responds that the ALJ appropriately disregarded Lawenda's opinion as unsupported by objective evidence and inconsistent with the record as a whole.

Physicians render two types of opinions in disability cases: (1) medical, clinical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work.  *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ is "not bound by an expert medical opinion on the ultimate question of disability."  *Tomasetti*, 533 F.3d at 1041; S. S. R. 96-5p.  The regulations provide that medical opinions be evaluated by considering (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion.  28 C.F.R. § 404.1527(d).

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)."  *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician.  *Id.*  The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians.  20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631.  A treating physician is employed to cure and has a greater opportunity to know and observe the patient.  *Sprague*, 812 F.2d at 1230.  Nonetheless, a treating physician's opinion is not conclusive ///

1   as to either a physical condition or the ultimate issue of disability.  *Magallanes v. Bowen*, 881

2   F.2d 747, 751 (9th Cir. 1989).

3          Judge Graham found that Dr. Lawenda had conservatively treated Plaintiff with daily

4   narcotic pain relievers and regular anti-inflammatory medications.  Lawenda referred Plaintiff for

5   pain management services.  With regard to Lawenda's opinion of Plaintiff's residual functional

6   capacity, the ALJ wrote:

7          Dr. Steven Lawenda, completed a Physical Residual Functional Capacity
          Questionnaire on June 7, 2009.  He diagnosed chronic neck pain, migraines,
8          depression, anxiety, hypothyroidism, and hyperlipedemia.  He gave the claimant a
          fair prognosis and found her totally disabled.
9
          I give no weight to Dr. Lawenda's most generous assessment because it is not
10         consistent with the objective findings or the record as a whole.  It appears that he
          based his opinion mainly on the claimant's subjective complaints.  In his findings
11         he noted that claimant had "severe neck pain", however at the hearing, the claimant
          failed to even mention that she had neck pain.
12
          AR 21 (*citations to administrative exhibits omitted*).
13
14         Once a court has considered the source of a medical opinion, it considers whether the

15  Commissioner properly rejected a medical opinion by assessing whether (1) contradictory

16  opinions are in the record; and (2) clinical findings support the opinions.  The ALJ may reject the

17  uncontradicted opinion of a treating or examining medical physician only for clear and convincing

18  reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 831.  Even though the

19  treating physician's opinion is generally given greater weight, when it is contradicted by an

20  examining physician's opinion that is supported by different clinical findings the ALJ may resolve

21  the conflict.  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).  The ALJ must set forth a

22  detailed and thorough factual summary, address conflicting clinical evidence, interpret the

23  evidence and make a finding.  *Magallanes*, 881 F.2d at 751-55.  The ALJ need not give weight to

24  a conclusory opinion supported by minimal clinical findings.  *Meanel v. Apfel*, 172 F.3d 1111,

25  1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751.

26         Although an ALJ is not bound by uncontroverted opinions rendered by a plaintiff's

27  physicians regarding the ultimate issue of disability, he or she cannot reject them out of hand, but

28  must set forth clear and convincing reasons for rejecting them.  *Matthews v. Shalala*, 10 F.3d 678,

1  680 (9th Cir. 1993). The ALJ must tie the objective factors or the record as a whole to the opinions

2  and findings that he or she rejects. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

3     Relying on *Embrey*, Plaintiff argues that the ALJ was required to articulate more fully his

4  reasoning in rejecting Lawenda's opinion.  *Embrey* is distinguishable from this case.  In finding

5  the Embrey was not disabled, the ALJ rejected the opinions of three treating physicians and one

6  consulting physician that Embrey was permanently and totally disabled.  The Court stated that,

7  "where the opinions of the physicians differ[ed] so markedly from the ALJ's, it [was] incumbent

8  on the ALJ to provide detailed, reasoned, and legitimate rationales for disregarding the

9  physicians' findings."  *Id.*  Here, the nonconforming opinion is Lawenda's: the opinions of

10 Plaintiff's other physicians and of the examining physicians both contradict Lavender's opinion

11 and are based on objective evidence.  Significantly, the contradictory opinions of Drs. Holmes,

12 Ling, and Wali are the opinions of Kaiser Permanente specialists to whom Lawenda referred

13 Plaintiff for assistance in diagnosing and treating her physical complaints.  In addition, Lawenda's

14 own objective findings, which included absence of atrophy and intact nerves and reflexes, are

15 inconsistent with his opinion of Plaintiff's residual functional capacity.

16    As the ALJ recognized, unsupported by test results or other objective measurement,

17 Lawenda's opinion could only have been based on Plaintiff's subjective complaints because the

18 objective findings included within the record did not support Lawenda's opinion.  *Regennitter v.*

19 *Commissioner of Social Security*, 166 F.3d 1294, 1299 (9th Cir. 1999), can also be distinguished

20 since the ALJ in that case mistakenly construed two consistent medical opinions as contradictory.

21    An ALJ is not required to accept the opinion of any physician, including a treating

22 physician, if the opinion is brief, conclusory, and inadequately supported by clinical findings.

23 *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). When a treating physician's medical

24 opinion is contradicted by the opinion of another physician, the ALJ is required to do no more

25 than provide specific and legitimate reasons for discounting the treating physician's opinion.

26 *Bray v. Commissioner of Social Security Admin.*, 554 F.3d 1219, 1228 n.8 (9th Cir. 2009).  The

27 ALJ did so here.

28 ///

**IV.**     **Conclusion and Order**

      For the reasons discussed above, this Court hereby AFFIRMS the agency's determination to deny Plaintiff disability benefits.  The Clerk of Court is directed to enter judgment for Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

**Dated:     January 11, 2012          _____/s/ Sandra M. Snyder_____**
                                      UNITED STATES MAGISTRATE JUDGE